UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TRANSPORTATION INSURANCE COMPANY
and NATIONAL FIRE INSURANCE COMPANY
OF HARTFORD,

                Plaintiffs,

                                        Case No. 08-15018

v.                                     Honorable Julian Abele Cook, Jr.

CITIZENS INSURANCE COMPANY OF
AMERICA,

                Defendant.


<u>ORDER</u>

      In this case, the Plaintiffs, Transportation Insurance Company and National Fire Insurance Company of Hartford, as subrogees of the Dailey Company ("Dailey"), contend that Giannola Masonry ("Giannola"), an insured of the Defendant, Citizens Insurance Company of America ("Citizens Insurance"), breached the Dailey-Giannola subcontract when it failed to indemnify them for the damages that it paid to resolve the dispute in *Perez v. Dailey Co.* (Macomb Circuit Court, Case No. 07-35330NO). *Perez* was a lawsuit that arose from the very serious and permanent injury claims by David Perez - a mason who had been employed by Giannola at a construction site for which Dailey was the general contractor.

      A bench trial was held from March 13th to March 15th of 2012. The Court now renders its findings of fact and conclusions of law regarding the Plaintiffs' breach of contract claim. To the extent that any findings of fact by the Court may be construed to be conclusions of law, they are adopted as such. To the extent that any conclusions of law may be reasonably deemed to be

findings of fact, they are so adopted.

## I. FINDINGS OF FACT[1]

### A.    Background Information

1.    Dailey was the general contractor of a two-story courthouse construction project ("the work site") in Clinton Township, Michigan. Dailey, a Michigan corporation, was insured by the Plaintiffs, both of which were Illinois corporations during all of the times that are relevant to this litigation. Chuck Walsh was its foreman at the work site.

2.    Dailey retained Giannola as a subcontractor to construct masonry walls for the project. Giannola, a Michigan corporation, was insured by Citizens Insurance, also a Michigan corporation. Neil Schroeder was Giannola's foreman at the work site. David Perez was a mason who was an employee of Giannola.

3.    Dailey retained the Huron Acoustic Tile Company ("Huron"), a Michigan corporation, as a subcontractor to perform carpentry work on the interior walls of the project. Ray Beaman was its foreman at the work site.

4.    Dailey retained numerous other subcontractors who were also working at the work site during the relevant time period.

### B.    The Underlying Accident, Lawsuit, and Settlement

5.    On or around June 15, 2007, Huron took delivery of a shipment of metal wall studs from Jaimes Industries ("Jaimes") at the work site.

6.    The wall studs were shipped in packages of ten individual studs that were banded

---

[1]Citations to the trial transcript hereinafter will be designated in the following manner: (1) transcript from March 13th will be identified as Tr. I; (2) transcript from March 14th will be marked as Tr. II; and (3) transcript from March 15th will be listed as Tr.III.

together into a group called a "bundle." Several bundles were stacked together atop two "4 x 4" pieces of wood (called "dunnage") that were arranged perpendicularly to the studs. The bundles and the dunnage (together, called a "bunk" or a "lift") were banded together.

7.    Jaimes delivered the bunks of studs directly to the east side of the second floor of the project. At that time, the bricking of the exterior eastern wall of the second floor had not been completed. Thus, it became necessary for Jaimes to use a boom truck to lift the bunks into the building.

8.    A toe board, which measured 2 3/4 inches high, ran along the edge of the exterior floor on the second floor to prevent objects from rolling or sliding over the edge.

9.    The eastern wall also had a guardrail, which consisted of two horizontal steel cables that were attached to the building's steel columns. The guardrail system had been installed to prevent people from falling from the edge.  However, it was not designed to prevent objects from falling over the edge.

10.   The toe board and guardrail were installed by Kirby Steel, a subcontractor who is not a party to this litigation.

11.   As Jaimes delivered the bunks, Beaman would relocate them through the use of a pallet jack. Because the dunnage that came with the bunks provided an insufficient ground clearance for the pallet jack, Beaman placed additional dunnage, in the form of an additional "4 x 4" piece of wood on each side underneath any bunks that needed to be moved. The additional dunnage ran parallel to the dunnage within the bunk.

12.   Beaman placed these studs approximately two feet and four inches from the east edge of

3

the second floor. The studs ran from north-to-south, and the dunnage ran from east-to-west with one piece beneath the south end and one under the north end of the studs.

13.     The additional pieces of dunnage that Beaman placed under this particular bunk were not the same length as the dunnage that came with the bunk. Specifically, the top piece of southernmost dunnage extended seven inches beyond the lower piece on the east side and four inches beyond the lower piece on the west side. This created an unstable foundation for the studs.

14.     At a regularly scheduled weekly meeting, Schroeder told the other subcontractors that the masons under his supervision would be working on the northwest, southwest, and northeast corners of the project. At the same time, Beaman announced that the Huron employees would be installing interior walls on the west side of the second floor.

15.     On the morning of June 26th, Schroeder assigned his masons to work on the southwest corner of the roof, the northwest stairwell, and the south wall. After lunch, he reassigned Perez and another mason, Steven Sherlock, to erect a block wall along the east side of the ground floor.

16.     Before assigning Perez and Sherlock to their new work location, Schroeder told Walsh that he would be moving some of his workers to the east side. Schroeder spent approximately forty-five minutes thereafter in preparation for the planned work by (1) conducting a visual inspection of the area to ensure that there were no trip hazards; (2) clearing the area of debris; (3) organizing the work materials and setting the lines that would guide the placement of the blocks; (4) looking into the first floor of the building

4

to see if there was any activity; and (5) walking back from the building approximately forty feet to look up to the second floor.

17.    When he looked up, Schroeder did not see any workers or other signs of activity at the east edge of the second floor. Furthermore, he neither saw the bunk of studs that was twenty-eight inches from the edge nor any cardboard box or trash bag hanging over the edge of the second floor.

18.    Schroeder acknowledged that, from his vantage point on the ground, he knew that there was nothing to prevent an object from going over the edge if it was higher than the toe board.

19.    Schroeder had seen bunks of studs stored on the east side of the building prior to the day of the accident. However, Schroeder recalled that the bunks which had been seen by him were not stored as close to the edge of the building as the bunk from which the bundles eventually fell, noting that they were stored "[a]ll different numbers" of feet from the edge.

20.    Schroeder knew that he could not determine from his vantage point on the ground whether any work activity was taking place near the east edge of the second floor.

21.    Schroeder acknowledged that he had been taught in his OSHA training that, before placing workers beneath an open edge, he should go upstairs and inspect the location above to ensure that there were no objects that could fall over the edge. (Tr. I at 117:2-6).

22.    Schroeder also opined that if he had gone up to the second floor and seen the location of the bunk, he (a) would have known that it would have been dangerous for his masons to

5

work below, and  (b) would not have allowed them to do so. (Tr. I at 121:23-123:7, 125:25-127:8).

23.    Schroeder had seen the Huron workers working on the west side of the second floor several times on the day of the accident. However, just as Giannola was working in a different location than had been announced during that morning's meeting with the subcontractors, Schroeder knew that other trade persons may also work in areas other than where they had been originally scheduled. (Tr. I at 106:2-10).

24.    Perez and Sherlock began working on the north end of the east wall, with Perez working on the outside face and Sherlock working on the inside face of the wall.

25.    At that time, Huron employees were installing studs on the second floor of the west side of the building. Schroeder had seen them working there frequently during that day and in the preceding days because he had to pass by the site of the accident area in order to access the roof, where the masons under his supervision were working. He was unable to see the bunk of studs on the east side of the second floor from that vantage point because the interior walls that had already been erected blocked his view.

26.    At approximately 1:10 p.m., Huron employee Steve Dallas walked to the northeast side of the second floor to retrieve a bundle of studs. At that time, the bunk was between eighteen and twenty-four inches tall at its highest point, which was on the east side of the pile. He removed the west-most bundle of studs from the bunk and was centering it on his shoulder when he heard other studs falling to the floor.

27.    When Dallas lifted the bundle from the west side, the excess weight on the east side caused the uneven dunnage to cantilever, and several bundles of studs rolled or fell off

6

the east side of the bunk. One bundle and one loose stud rolled or bounced over the edge of the second floor.

28.    The bundle or loose stud struck Perez on the head and caused him to sustain extensive personal injuries.

29.    Shortly after the accident, Huron employees began moving bundles of studs away from the edge so that no additional studs would fall.

30.    Photographs that were taken after the accident show a cardboard box in close proximity to the edge and a trash bag hanging over the edge of the second floor. However, it is unclear when these items were placed in those locations, and there is no evidence that they were there at any time prior to the accident.

31.    Perez initiated a lawsuit against Huron and Dailey, *Perez v. Dailey Co.* (Macomb Circuit Court, Case No. 07-35330NO), which he ultimately settled for twelve million dollars.

32.    The Plaintiffs, on behalf of Dailey, contributed six million dollars toward the settlement. Citizens Insurance, also acting on behalf of Dailey, contributed one million dollars toward the settlement. with the remaining five million dollars coming from Huron's insurer.

33.    Pursuant to the terms of the settlement agreement, the Plaintiffs and Dailey released all of their claims against Citizens Insurance and Giannola except for the contractual indemnity and "additional insured" insurance coverage.

        C.    <u>Procedural History of this Action</u>

34.    The Plaintiffs filed this action seeking contractual indemnification and "additional insured" coverage under the Citizens Insurance's insurance policy with Giannola.

35.  In a prior order, the Court held that Dailey had qualified as an "additional insured" to the extent of one million dollars in primary coverage and one million dollars in excess coverage (one million dollars of which Citizens Insurance had already paid on Dailey's behalf to settle the *Perez* case). The parties subsequently settled the "additional insured" issue, with Citizens Insurance paying one million dollars to the Plaintiffs, which had the effect of reducing their remaining contractual indemnity claim to five million dollars.

36.  The Court also held that, pursuant to the Dailey-Giannola subcontract, Citizens Insurance  is contractually required to indemnify the Plaintiffs unless the accident was caused by the sole negligence of (collectively) Dailey and/or its officers, agents, servants, or independent contractors who were directly responsible to Dailey (other than Giannola). It was also determined by the Court that there remained a genuine issue of a material fact as to whether Giannola was negligent. If so, the Defendant would be required to indemnify the Plaintiffs in the amount of five million dollars.  If not, Citizens Insurance would not owe anything to the Plaintiffs.

D.  Relevant OSHA/MIOSHA Standards

37.  The Occupational Safety and Health Administration ("OSHA") and its Michigan counterpart, MIOSHA, set detailed safety and health standards for the construction industry. 29 C.F.R. § 1926 et seq. As it is relevant here, MIOSHA has incorporated the relevant OSHA standards or has adopted its own standards that are, in pertinent part, essentially the same as the OSHA standards.

38.   Pursuant to what is known as the general duty clause, all employers "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

39.   The Plaintiffs' expert witness, Michael Wright, testified that the term "recognized hazard" refers to a safety problem that OSHA has officially recognized.   Similarly, MIOSHA safety officer, Brian Renaud, testified that a "recognized hazard" is accepted throughout the industry as a standard or a practice that can cause an injury to workers.[2] Under either definition, falling objects are recognized as hazards. (Tr. I at 189:29-190:1; Tr. II at 100:11-14).

40.   Several relevant OSHA standards require every employer to have a "competent person" on site at all times that their employee is working. A "competent person" is defined as "one who is capable of identifying existing and predictable hazards in the surroundings or working conditions which are unsanitary, hazardous, or dangerous to employees, and who has authorization to take prompt corrective measures to eliminate them." 29 C.F.R. § 1926.32(f).

41.   On multi-employer work sites, such as the work site involved here, the prime contractor

---

[2]The Court is aware that the Defendant's expert witness, Steven Williams, seemed to put a different gloss on this term during his testimony. (*See* Tr. II at 163:2-164:5 ("Recognized means a hazard that an employer is familiar with. And it's one that . . . he or she can see. And it's recognized, recognizable as something that can adversely affect the job and possibly cause someone to get injured.")). To the extent that Williams intended to suggest that the general duty clause is only implicated when an employer has actual knowledge of a personally recognized hazard, this gloss would seem to conflict with the requirement that an employer exercise due diligence in order to proactively discover legitimate safety concerns. *see infra*. The Court rejects

(here, Dailey) has the primary responsibility for complying with all relevant OSHA obligations, and a subcontractor shares joint responsibility with the prime contractor with respect to that subcontractor's portion of the work. 29 C.F.R. § 1926.16.

42.    A subsequent OSHA policy for use in determining which, if any, employers to cite in a multi-employer work site also creates different responsibilities for the following categories of employer: (1) a *controlling employer* is one with general authority over the work site, as well as the power to correct, or require correction of, safety and health violations; (2) a *creating employer* is one that causes a hazardous condition which violates an OSHA standard; and (3) an *exposing employer* is one whose own employees are exposed to a hazard. This policy further specifies that an exposing employer who is not   a creating employer is subject to citation if it knew of a hazard or failed to exercise reasonable diligence to discover it and failed to take steps consistent with its authority to protect its employees. (*See* Tr. I at 186:5-187:13; Def.'s Ex. KK).

43.    OSHA mandates that "no contractor or subcontractor for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety." 29 C.F.R. § 1926.20(a)(1). Each employer's accident-prevention responsibilities include the obligation to "initiate and maintain such programs as may be necessary to comply with this part," *id.* § 1926(b)(1), where such programs "shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons designated by the employers," *id.* §

---

this interpretation.

10

1926(b)(2).

44.    Material stored inside buildings must be at least ten feet away from any exterior wall that does not extend above the top of the material stored. 29 C.F.R. § 250(b)(1); MIOSHA R. 408.40818(13).

45.    Lumber must be "stacked on level and solidly supported sills" and "so stacked as to be stable and self-supporting." 29 C.F.R. § 250(b)(8)(ii) and (iii); *see also* MIOSHA R. 408.40820(1). All parties agree that this provision applies to the metal studs at issue here.

46.    If employees are exposed to falling objects, they must wear hard hats and their employer must implement one or more measures to protect them. These measures include (a) erecting toe boards, screens, or guardrail systems; (b) creating a canopy structure and keeping potential falling objects at a safe distance from the edge; or (c) barricading the area to which objects could fall and keeping potential fall objects at a safe distance from the edge. 29 C.F.R. § 1926.501(c).

47.    Here, the toe board was 3/4 of an inch lower than required under standards set by OSHA/MIOSHA. 29 C.F.R. § 1926.502(j)(3).

         E.    MIOSHA Investigation and Expert Witness Opinions

48.    MIOSHA assigned safety officer, Brian Renaud, to conduct an investigation of the accident about which Perez has complained. .

49.    During the course of his investigation, Renaud (a) spoke with various witnesses, including Walsh, Schroeder, Beaman, and Dallas; (b) took photographs and measurements at the scene; (c) reviewed witness statements given to Dailey; and (d) read

11

Huron's safety policy.

50      OSHA cited Huron for (a) storing the bunk too close to the edge of the second floor; (b) storing the bunks on unstable dunnage; (c) having its employees store and handle materials near an improper toe board; and (d) failing to include information about fall protection and material storage in its safety policy. The first two violations were categorized as "serious" whereas the latter two were categorized as "other than serious."

51.     The parties agree that Huron had been negligent.

52.     In his report that was utilized in the *Perez* litigation, the Plaintiffs' expert witness, Michael Wright, concluded that Huron had (a) "failed its safety duty to provide a safe workplace for the other contractors' employee Mr. David Perez" and (b) failed to adequately train or supervise Dallas. (Expert Witness Report of Michael C. Wright at 9-10, Def.'s Ex. ZZZ). He also opined that these failures, particularly the former, were a proximate cause of Perez's injuries. In his trial testimony, Wright opined that Huron was negligent in (a) placing the bunk too close to the edge and (b) placing the bunk on unstable dunnage.

53.     The Defendant's expert witness, Steven Williams, prepared a report in which he concluded that Huron had violated several MIOSHA rules. In his testimony during the trial, Williams opined that Huron had been negligent.

54.     MIOSHA cited Dailey for failing to (1) properly train and supervise its workers and subcontractors regarding the handling and storing of material and the erection of overhead protection; and (2) ensure the erection of a proper toe board. Both violations were categorized as "other than serious."

12

55.     The parties agree that Dailey was negligent.

56.     In his report during   the *Perez* litigation, Wright concluded, *inter alia*, that Dailey had failed to satisfy industry standards and fulfill its duty to provide safe work conditions for the workers. In his trial testimony, Wright opined that Dailey was negligent in (a) not ensuring an adequate guard rail system; (b) failing to recognize the danger posed by the placement of the bunk; and (c) failing to adequately train its on-site competent person, Chuck Walsh, with respect to these hazards.

57.     The Defendant's expert witness, Steven Williams, prepared a report in which he concluded that Dailey had violated several MIOSHA rules. During the trial, he opined that Dailey had been negligent.

58.     MIOSHA did not issue any citations to Giannola. Renaud testified that MIOSHA will issue a citation only if two conditions are met; namely, (a) an employee was actually or potentially exposed to a hazard; and (b) the employer had actual knowledge, or should have, through the exercise of reasonable care and due diligence, gained the knowledge that its employees were or could be so exposed. He believed that it was not reasonable to have expected Schroeder to go to the second floor to perform an inspection when his look up did not reveal any indication of present work or activity. Thus, Renaud opined that Schroeder's inspection, including his view of the second floor from the ground at a distance of approximately forty feet, was reasonably diligent. Nevertheless, Renaud acknowledged that another MIOSHA safety officer - if presented with the same opportunity to opine - could have reached a different conclusion regarding Giannola.

59.     In his report, Williams concluded that (a) Giannola had complied with the relevant work

13

rules and regulations, and (b) Schroeder had exercised reasonable care when he sought Walsh's permission to move his masons to the east side of the construction site at ground level; inspected the ground area for hazards; and looked up from the ground level and saw no activity taking place on the second floor. His trial testimony reiterated these conclusions. Williams acknowledged that, if Schroeder had seen the bunk from the ground, he would "absolutely" have had a duty to go up to the second floor to inspect.

60.   In his report in the *Perez* litigation, Wright did not render any opinion as to whether Giannola had violated any MIOSHA standards. During the trial, Wright testified that (a) he had been asked to consider only Huron and Dailey in that case and that he had not included any opinions regarding Giannola because he was not asked to do so. He also testified that, in his opinion, Giannola had been negligent in several ways: (a) it had failed to properly train Schroeder as a "competent person;" (b) Schroeder's duty to inspect the work site included an inspection of the area above which his masons would be working, and his inspection for falling object hazards was inadequate when he looked up from the ground level rather than walking up to the second floor; and (c) Schroeder failed in his duty to discover and abate hazards, including the bunk of studs that fell onto Perez.

## II.  CONCLUSIONS OF LAW

The jurisdiction of the Court in this case is founded on a diversity of citizenship among the parties.   Hence, the substantive law of  Michigan governs. *Erie Railroad v. Tompkins*, 304

U.S. 64 (1938). In order to identify the applicable case law, the Court looks first to "the law of the state's highest court. If the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it." *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985).

Although there is an abundance of relevant OSHA/MIOSHA standards and conflicting expert opinions, this is a relatively straightforward case. It is clear - and all parties agree - that Huron and Dailey were negligent. However, their evaluation of the negligence issue is not relevant to the disposition of this case. The sole question is whether Giannola and/or its foreman, Neil Schroeder, were also negligent. If not, the exclusion to the indemnification provision in the Dailey-Giannola subcontract is triggered, and the Plaintiffs will not be entitled to indemnity from Citizens Insurance.

Significantly, the subcontract provides, in relevant part, that Giannola will indemnify Dailey for all liability "resulting from injury to . . . any person (including [Giannola's] employees) . . . , which injury . . . arises out of or is any way connected with the performance of work under this Subcontract." (Giannola-Dailey Subcontract at § 11.1, Copy at Def.'s Ex. P). However, it should be noted that this provision also includes an exclusion whereby the indemnification obligation is not triggered if the injury "aris[es] from the sole negligence of [Dailey], its officers, agents, servants, or independent contractors (other than [Giannola]) who are directly responsible to [Dailey]." (*Id.*). The Court has previously construed this language to mean that the exclusion applies to the instant case, and Dailey is not entitled to indemnification "for those injuries arising out of the 100% *collective* negligence by Dailey Company and/or one its officers, agents, servants, or independent contractors (except Giannola Masonry)." *Transp.*

15

*Ins. Co. v. Citizens Ins. Co. of Am.*, No. 08-15018, 2010 WL 3245418, at \*8 (E.D. Mich. Aug. 17, 2010).

Under Michigan law, a "negligence claim requires proof of (1) duty; (2) breach of that duty; (3) causation, both cause in fact and proximate causation; and (4) damages." *Romain v. Frankenmuth Mut. Ins. Co.*, 762 N.W.2d 911, 913 (Mich. 2009). Citizens Insurance concedes that Giannola owed a duty to Perez who was injured and damaged. Thus, the only dispute is with the second and third   above-identified *Romain* elements.

However, in an effort to determine if a duty was breached, the Court first must identify the relevant standard of care. Giannola owed Perez the duty to exercise reasonable (or "ordinary") care, defined generally as " the care that a reasonably careful person would use under the circumstances." *Case v. Consumer Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000); *see also Detroit & M.R. Co. v. Van Steinburg*, 17 Mich. 99, 118-19 (1868) ("Negligence . . . consists in a want of that reasonable care which would be exercised by a person of ordinary prudence under all the existing circumstances, in view of the probable danger of injury."). "Clearly, 'reasonable care under the circumstances' represents a sliding scale. The more severe the potential injury, the more resources a reasonable person will expend to try and prevent that injury. Similarly, the greater the likelihood that a severe injury will result, the greater the lengths a reasonable person will go to prevent it." *Case*, 615 N.W.2d at 21.

In the construction context, OSHA and MIOSHA standards may help guide this inquiry, in that they serve as evidence of the standard of care and a violation of these standards may serve as evidence of a breach of that standard of care. "In Michigan, in

an employer-employee [relationship] . . . , a violation of occupational safety statutes may be used as evidence of negligence, specifically, the standard of care element in a negligence action, but does not affect or enlarge or affect the common-law duties or liabilities of the alleged wrongdoer." *Bryan v. Wayne Disposal, Inc.*, No. 02-CV-74921-DT, 2006 WL 250268, at *3 (E.D. Mich. Jan. 31, 2006) (citing *Zalut v. Andersen & Assocs., Inc.*, 463 N.W.2d 236, 239 (Mich. Ct. App. 1990)). However, "[w]hile it may be evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances." *Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 180 (Mich. 1993) (citations omitted). Although a violation of an OSHA or MIOSHA standard  - or absence thereof - is helpful to this inquiry, it is not necessarily determinative. *See Sanderson v. Cahill Constr. Co.*, No. 294939, 2011 WL 1262141, at *4 (Mich. Ct. App. Apr. 5, 2011) (citing *Zalut*, 463 N.W.2d at 239) ("OSHA and MIOSHA violations may supply evidence of negligence, but do not constitute negligence per se.").

Whether guided by evidence of a violation of OSHA/MIOSHA standards, or based on the general duty of standard care, the Court concludes that Giannola violated its duty to Perez.

An ordinarily prudent person in Schroeder's position should not have placed his workers beneath the open edge of the second floor without first going up to the second floor to determine if there were any objects that posed a risk of falling onto the workers below. Renaud testified that a reasonable person would understand that, because of

17

the angles of the sight lines, he would not have been able to see short objects when looking up to the second floor from a vantage point on the ground. He also testified that, in such circumstances, it would be reasonable to understand that unseen objects may be up there that could fall over the edge. If a reasonable person would understand this, then a reasonable person should have gone upstairs to inspect the area to determine if there were, in fact, any such unseen objects.[3] Moreover, as Schroeder testified, if he had seen the bunk placed so close to the edge, he would have known that it was a hazardous condition and would not have permitted his masons to work under it unless and until the hazard had been abated. Williams agreed that if Schroeder had seen the bunk from his vantage point on the ground, he would have had a duty to go up to the second floor to inspect further.[4]

---

[3]Although the Court does not decide on this basis, it does harbor doubt about the plausibility of the Defendant's argument that the bunk was not visible from Schroeder's vantage point 40 feet away from the building. As a matter of simple geometry and trigonometry, and assuming (generously) that the second floor was 20 feet high (*see* Tr. II at 82:16-83:5), an object measuring 18-24 inches tall located 28 inches from the edge of the building would have been visible over the 2.75 inch toeboard to a man of Schroeder's height standing 40 (or even 30) feet away from the building.

[4]Renaud testified that, even if Schroeder had seen the bunk from his vantage point on the ground, it still would be unreasonable to expect him to "have done a lot of scrutiny on that material." (Tr. II at 67:8-13). To the extent that Renaud was suggesting that Schroeder would have had no duty to conduct further inspection even after having seen material stacked so close to the edge, the Court disagrees. Even if it would be unreasonable to expect Schroeder to have gone to the second floor after not seeing any activity or material from his vantage point on the ground - a conclusion that the Court does not accept, in any event - it plainly would have been unreasonable for him not to conduct an inspection upstairs if he had seen the location of the bunk. Renaud did acknowledge, however, that if Schroeder had seen the bunk *and* had recognized the hazard of it falling over the edge, his assessment would have been different. However, the Court cannot understand how a competent person could see the bunk situated within twenty-eight inches of an unbricked edge and *not* have recognized it to be a hazard.

As the *Case* court noted above, "[t]he more severe the potential injury, the more resources a reasonable person will expend to try and prevent that injury. Similarly, the greater the likelihood that a severe injury will result, the greater the lengths a reasonable person will go to prevent it." *Case*, 615 N.W.2d at 21. Here, Schroeder knew that once his workers were situated below the edge, they were unable to see, hear, or otherwise detect work above them which could cause construction materials to fall upon them without warning or time to avoid them. The degree of danger from objects falling from the second floor is obvious, and - although the exact percentage of injuries that result from such accidents is unknown - such injuries are not rare at construction projects. It is equally obvious that a falling object could seriously injure or even kill a worker below. In light of the severity of the potential injury, a reasonable person would have expended the relatively minimal additional time it would have required to go up to the second floor to inspect for falling hazards.

Indeed, such a potential problem is a "recognized hazard" under OSHA and MIOSHA standards against which Giannola had a duty to protect its employees pursuant to the general duty clause, 29 U.S.C. § 654(a)(1) (all employers "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."). For the reasons that have been stated above, the Court concludes that Giannola violated this duty. The Court also believes that, under the relevant MIOSHA procedures, Giannola was citable for this violation as an exposing employer because (1) Perez was actually exposed to a hazard (no party disputes this) and (2) Giannola should have, through the exercise of reasonable care and due

19

diligence, known of this exposure.

Citizens Insurance argues that it would not be reasonable to expect Schroeder to have discovered the uneven dunnage. That may be so, but, as Schroeder has acknowledged, the placement of the bunk so close to the edge was, by itself, a hazard, the discovery of which would have caused him not to place his workers underneath the east edge. Indeed, even without the uneven dunnage, it would have been foreseeable that a bundle of studs could be knocked off the bunk and fall over the edge. Although, in this instance, it was a combination of the placement of the bunk and the uneven dunnage that caused the accident, the element of duty does not require that the exact manner or mechanism of injury was foreseeable. Instead, it is sufficient if it was foreseeable that some injury might occur. *E.g.*, *Schultz*, 506 N.W.2d at 179 n.7 (to establish that duty was owed, "plaintiff need not establish that the mechanism of injury was foreseeable or anticipated in specific detail. It is only necessary that the evidence establishes that some injury to the defendant was foreseeable or to be anticipated").

Citizens Insurance submits that the hazard which caused Perez' injury, and its location on the east side of the second floor, were outside of the scope of Giannola's work, and, therefore, outside of its obligation to protect its employees.[5] The Court

---

[5]Williams, the Defendant's expert witness, relied heavily on what the Court concludes is an unreasonably narrow construction of the term "scope of work" in reaching his conclusion that Huron and Dailey, but not Giannola, were negligent. (Tr. II at 135:2-7, 136:10-15, 141:14-24, 148:14-20, 155:24-156:5, 156:23-157:4, 165:17-23, 187:23-188:9, 188:18-190:4, 192:3-194:5, 199:1-4). Williams argues, in essence, that Giannola did not have any obligation to detect and abate any hazards that were not related to "masonry activities." Under this argument, Giannola would have had no duty to inspect for any hazards to which its employees were exposed if those hazards were not, so to speak, masonry-created hazards. Yet this argument does not square with either (1) the testimony of Wright or Renaud or (2) his own testimony that Schroeder would have

rejects this argument. As Wright and Renaud both testified, an employer's work area includes the area above where his employees are working. Even though it was not Giannola's responsibility to place the bunks in an appropriate location and on appropriate dunnage, it was Giannola's responsibility to determine - prior to directing its employees to work in a particular location - whether those employees would be exposed to a hazard from above and, if so, to take appropriate action. For all the reasons that have been set forth above, the Court concludes that Giannola breached this duty.

The Court next turns to the causation element of the negligence claim. The Plaintiffs suggest that evidence of proximate causation is not required here. The subcontract provides that the indemnification obligation is triggered by an injury which "arises out of or is in any connected with the performance" of the subcontract. (Giannola-Dailey Subcontract at § 11.1, Copy at Def.'s Ex. P). In an earlier order, the Court construed the "connected with" language as requiring only a "logical link" between the injury and Giannola's work under the subcontract. Noting that "[i]t is logical to assume that if Perez had not been attending to his masonry work at the project site at the time of his injury, it is highly unlikely that he would have been injured in the manner which has been described in the pleadings," *Transp. Ins. Co. v. Citizens Ins. Co. of Am.*, No. 08-15018, 2010 WL 3245418, at *6 (E.D. Mich. Aug. 17, 2010),

---

"absolutely" had a duty to conduct an inspection on the second floor if he had seen the bunk from the ground. As the bunk was not associated with masonry activities, under Williams's construction of the term "scope of work," Schroeder would not have even had a duty not to place his workers under a bunk of studs that was hanging over the edge. The Court rejects this conclusion.

the Court determined that such a link existed.

However, the Plaintiffs make an unjustified logical leap when they argue that this holding excuses them from having to show the traditional negligence element of causation. The fact that nothing more than a "logical link" is required to trigger the indemnification obligation does not alter in any way the elements of negligence that are necessary to determine whether the exclusion is operational. Put another way, the subcontract says if an injury is logically linked to Giannola's work, it is required to indemnify Dailey *unless* it and its non-Giannola subcontractors are collectively 100% negligent. The two steps are distinct, and the fact that legal causation is not required for the first step does not mean that it is not required for the second.

Having determined that the causation element is not excused by the terms of the contract, the Court now turns to the question of whether causation has been shown. In order to show causation, a party must proffer both cause in fact and legal (or proximate) cause. *Case*, 615 N.W.2d at 20 n.6 (citing *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994)). "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. . . [while] legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner*, 516 N.W.2d at 479 (citations omitted).

Here, the cause in fact element of causation is plainly satisfied. It is clear that but for Giannola's breach, Perez would not have been injured. Indeed, Schroeder acknowledged that he would not have placed his masons at their work sites if he had

observed the location of the bunk where it had been stored. Thus, but for his failure to perform an adequate inspection, Perez would not have been injured.[6]   Thus, the Court concludes that this proximate causation element has also been satisfied.

The falling object hazard (the bunk of studs placed improperly close to the edge of the unbricked edge) that caused the accident was a predictable hazard and a type of hazard well known to Giannola and its foreman, Schroeder, and the injury sustained by Perez was of the type that would be expected to result from being struck by a falling object. The risk of objects falling over an unguarded edge and causing injury to workers below is foreseeable when it is the edge of a common work area in which multiple different types of individuals have a right to be working. It is foreseeable under these overlapping work locations that one contractor may create a hazard for another subcontractor's employees by placing objects too close to an unguarded edge. Moreover, Schroeder knew that Huron had been storing studs on the east side of building. Even if he did not know that this particular bunk of studs had been placed as close to the edge as suggested by the evidence, he did know that the bunks were stored "[a]ll different numbers" of feet away from the edge. With knowledge that studs were being stored on the east side of the building structure, it was reasonable for him to expect that Huron workers would need to return to the area in order to retrieve this material and that, in the process, studs could fall over the edge and injure workers

_____

[6]It should go without saying that this determination does not suggest that Huron or Dailey did not also cause the accident. Indeed, the Court believes that these entities bear far more responsibility for the accident than does Giannola. However, the Court's task is not to determine which entity was the most responsible. Instead, the Court is only to determine if Giannola was at all responsible.

below.

Citizens Insurance argues that proximate cause is lacking because there was an intervening, superseding cause - to wit, "Mr. Dallas's act of removing [the bundle of studs] in an improper manner, from the west side of the bunk, creat[ing] the imbalance in the stationary bunk" - that broke the chain of causation with respect to Giannola. The Court disagrees. Although the removal of the bundle of studs was the last known act prior to the accident, it cannot seriously be argued that it was Dallas' action which should be deemed to be the legal cause of Perez' injury. Arguably, Citizens Insurance may have chosen to make this strained argument because of its realization that the law of intervening causes requires that the act   - which purportedly breaks the chain of causation - occurred *after* the acts that constituted the other purported causes. *E.g.*, *Poe v. City of Detroit*, 446 N.W.2d 523, 529 (Mich. Ct. App. 1989) ("An intervening cause, meaning one which comes into active operation in producing harm to another *after* the negligence of the defendant, may relieve a defendant from liability." (emphasis added)); *McMillian v. Vliet*, 374 N.W.2d 679, 682 (Mich. 1985) ("An intervening cause situation is distinguishable from concurrently operating causes in that it involves an intervening cause or act which begins operating after the actor's negligent act or omission has been committed." (citation and internal quotation marks omitted)).

The only relevant act that occurred after Giannola placed its masons under the unguarded second floor was Dallas' removal of the studs. According to the argument by Citizens Insurance, neither Huron (except to the extent it would be liable for Dallas'

removal of the bundle of studs) nor Dailey would be liable in negligence because of the purported intervening cause of Dallas' removal of the studs. Yet - for reasons that were exhaustively addressed during the trial and in the post-trial briefing period, Citizens Insurance went to great lengths to describe the failings of Huron and Dailey, even though their negligence was conceded by all of the parties to this case. Furthermore, it cannot seriously be contended that Dallas' conduct constituted an intervening cause which broke the chain of causation between Perez' injury and others acting on behalf of Huron, Dailey, and Giannola.[7]

   Citizens Insurance's argument suffers from yet another fatal flaw. As was made clear in those cases that it cited, an intervening cause will not relieve prior actors of liability if the intervening act was "reasonably foreseeable." *McMillian*, 374 N.W.2d at 682. The Defendant fails to explain - and the Court cannot fathom - how it would not have been foreseeable that a Huron employee would remove the closest bundle of studs from the very bunk of studs that was to have been removed by him. For these reasons, the Court rejects Citizens Insurance's intervening cause argument.

   Accordingly, the Court concludes that Giannola violated its duty to Perez, and this breach was a "but-for" and legal cause of his injuries. Because the contested issues regarding duty and damages were conceded by the parties, the Court also

---

[7]This argument places the Defendant in the unenviable position of simultaneously arguing that (1) "given that the uneven dunnage was not readily visible[,] it is unlikely that Mr. Schroeder would have been able to observe the uneven dunnage, even if he had going to the second floor and seen the bunk" (Def.'s Proposed Findings of Fact and Conclusions of Law at 55), and (2) Dallas removed the bundle in an unspecified "improper manner" by taking it from this same bunk without noticing the unstable dunnage and this constituted an intervening cause that would cut off liability for the very actors that placed the bunk in the unsafe location and upon unsafe dunnage. For perhaps obvious reasons, the Defendant does not carry its argument to its logical conclusion.

concludes that the Plaintiffs have established all elements of their negligence claim. This conclusion, in turn, means that (1) Dailey and its non-Giannola subcontractors were not collectively totally negligent, and (2) the exclusion to Giannola's indemnification obligation was not triggered thereby. For this reason, Citizens Insurance is required to indemnify the Plaintiffs in the amount of six million dollars, which shall be offset by the sum of one million dollars pursuant to the parties' stipulation, as noted in the order of this Court on December 19, 2011.

Accordingly, a judgment in the amount of five million dollars is entered in favor of the Plaintiffs. It should also be noted that the Plaintiffs also seek a recovery of their costs that were incurred by them in this litigation as well as an award of interest at the statutory rate. Rule 54 of the Federal Rules of Civil Procedure provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs - other than attorney's fees - should be allowed to the prevailing party." However, in this case, a prior order by this Court does "provide otherwise." In construing the *Perez* settlement agreement, the Court concluded that its "unambiguous language forecloses any attempt by the Plaintiffs to recover anything other than the six million dollars [now reduced to five million dollars, pursuant to a prior partial settlement agreement in this litigation] . . . . [T]he Plaintiffs are precluded from seeking attorney fees and costs related to the instant litigation." (Order at 22,  Aug. 17, 2010, ECF 22). Therefore, Rule 54 notwithstanding, the Plaintiffs are not entitled to an award of the costs that they incurred in this lawsuit.

Unlike the issue of costs, the question of interest has not previously been

explored by the Court, and the parties have not addressed the effect, if any, of the *Perez* settlement agreement as it relates to an award of interest. In light of (1) the limited right to continued litigation that has been reserved by the Plaintiffs in the *Perez* settlement, and (2) the large amount of interest that is at stake, the Court believes that additional briefing, which must be limited to this extremely narrow issue, would be beneficial to a final resolution of the issues in controversy. As the parties who seek to obtain an award of interest, the Plaintiffs are directed to file an opening brief which shall not exceed more than seven pages within ten days of the date of this order. The Defendant must file its response, if any, of not more than seven pages within ten days thereafter. In the absence of specific permission from the Court, no reply brief will be accepted.

### III.   CONCLUSION

For the reasons that have been set forth above, a judgment in the amount of five million dollars is entered in favor of the Plaintiffs. Costs are not awarded. The issue of interest will be resolved following the receipt of the parties' briefs by the Court in accordance with the schedule, as outlined above.


IT IS SO ORDERED.


Date: March 7, 2013                                       s/Julian Abele Cook, Jr.
                                                          JULIAN ABELE COOK, JR.
                                                          U.S. District Judge

27

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 7, 2013.

s/ Kay Doaks_____
Case Manager